IN THE COURT OF CRIMINAL APPEALS

OF TEXAS





NO. AP-75,049





ANTHONY ALLEN SHORE, Appellant


v.


THE STATE OF TEXAS





ON DIRECT APPEAL FROM CAUSE NO. 966,087

IN THE 339TH JUDICIAL DISTRICT COURT 

HARRIS COUNTY




 Johnson, J., delivered the opinion of the Court in which Price, Womack,
Keasler, Hervey, Holcomb, and Cochran, JJ., joined. Keller, P.J., concurred. 
Meyers, J., did not participate.


O P I N I O N


 In October 2004, a jury convicted appellant, Anthony Allen Shore, of a capital murder committed
on April 16, 1992. Tex. Penal Code Ann. § 19.03(a). Based on the jury's answers to the special issues
set forth in Texas Code of Criminal Procedure Article 37.071, Sections 2(b) and 2(e), the trial judge
sentenced appellant to death. Art. 37.071 § 2(g). (1) Direct appeal to this Court is mandatory. Art. 37.071
§ 2(h). After reviewing appellant's twenty points of error, we find them to be without merit. Accordingly,
we affirm the trial court's judgment and sentence of death.

Statement of Facts

 Appellant confessed to committing four murders in which he attacked and sexually assaulted, or
attempted to sexually assault his victims, an aggravated sexual assault that did not end in murder, and the
sexual molestation of two children.

 On September 26, 1986, appellant murdered fourteen-year-old Laurie Tremblay while attempting
to sexually assault her. In discussing this crime, appellant stated that he was preoccupied with young girls
and that he had met Tremblay by giving her rides on a semi-regular basis. During one of these rides,
appellant, then twenty-four years old, became sexually aggressive and unhooked the fourteen-year-old's
bra. She demanded that appellant stop, and the two argued. Appellant hit Tremblay in the back of the
head and then used a cotton cord to strangle her. According to appellant, the cord kept breaking, and he
injured his finger while tightening the ligature; "I tried to make sure that she would never, ever tell anybody." 
The strangulation left a knuckle impression on the back of Tremblay's neck, and the cord itself left two
distinct pressure lines. Appellant dumped the victim's body behind a restaurant. The crime remained
unsolved until 2003.

 On April 16, 1992, appellant, at twenty-nine years old, gave a ride to twenty-year-old Maria Del
Carmen Estrada, the victim in this capital-murder prosecution. Recounting the event, appellant stated that
she "freaked out" when he made sexual advances toward her, but he persisted in his attack, using a pair
of shears to aid in his attempt to rape her. He ultimately strangled Estrada by twisting a nylon cord around
her neck and tightening it with a piece of wood. As in his first murder, appellant dumped the victim's body
behind a restaurant and left. When Estrada's body was found, signs of trauma were apparent on her face. 
Her pants had been removed, her underpants and hose had been pulled below her pubic area, her shirt was
open, her bra had been cut, and her hose appeared to be cut in the crotch. An examination revealed that
Estrada's vagina had a bloody contusion deep inside. The crime remained unsolved until 2003.

 About a year and a half later, at thirty-one, appellant became infatuated with a fourteen-year-old
student who was often home alone after school. On October 19, 1993, she came home to find appellant
waiting for her. He was wearing baggy clothes, surgical gloves, sunglasses, and a bandana over his face. 
Appellant bound the girl's hands with an electrical cord and wrapped her head in duct tape. He took her
into the bedroom, took off her pants, and cut her panties off with a knife; appellant then raped the girl as
she screamed and cried. He then began choking her, but she managed to escape. Before fleeing the home,
appellant threatened that he would return and kill her and her family if she reported the crime. He also told
her that he had been watching her and named her school and sports activities. A sexual-assault examination
revealed that the victim's hymen and anus were torn, and that semen was present. DNA recovered from
that semen eventually pointed to appellant as its source. Appellant admitted to this crime, saying that he
had watched the girl during his work as a "telephone man." He admitted that he fantasized about her and
wanted to rape but not murder her; this depraved desire, he believed, was proof that he could "beat the
evilness" by possessing and controlling another human being without killing her. Again, the crime remained
unsolved until 2003.

 The next year, on August 7, 1994, appellant, at thirty-two years old, abducted, raped or attempted
to rape, and killed nine-year-old Diana Rebollar. He recounted that he saw the child walking down the
street while he was driving a van. He pulled into a parking lot and began talking to her. Noticing that
nobody else was around, appellant grabbed Rebollar, threw her into the van, duct taped her hands and feet,
drove behind a building, then attacked her. Her body was later found on the loading dock of a building,
naked except for her black t-shirt, which had been pulled up to her armpits, and her vagina and anus were
bloody. Appellant admitted to killing her by strangulation; a rope with a bamboo stick attached to it was
found around Rebollar's neck. This crime also remained unsolved until 2003.

 On, or soon after, July 6, 1995, appellant saw sixteen-year-old Dana Sanchez at a pay phone;
appellant was thirty-three. Appellant stated that Sanchez appeared angry, and he offered her a ride. 
Sanchez accepted the ride, but soon objected when appellant began touching her. She tried to evade him,
but he pulled her into the back of the van and restrained her after she bit his chest. He then removed her
clothes. Appellant claimed that he did not sexually assault Sanchez, but admitted that he did kill her. 
Sanchez's decomposed body was found after appellant made an anonymous call to a television news
station reporting that there was a "serial killer out there" and giving the body's location and a detailed
description of the victim. The nude body was found with a yellow rope wrapped around its neck; a
toothbrush was twisted in the ligature with a knot. Like the other murders, this crime remained unsolved
until 2003.

 About two and a half years after killing Sanchez, appellant plead no contest to two charges of
indecency with a child. The two victims were appellant's children. Appellant was charged with sexually
molesting his older daughter from the time she was in kindergarten until she was thirteen. She testified that
appellant would touch her breast, vagina, and anus as she pretended to sleep and that "[appellant] would
stand unclothed [at the doorway to her and her younger sister's bedroom] and touch himself
inappropriately." Appellant also began molesting his younger daughter, and both girls eventually informed
their aunt of the assaults. Appellant was arrested, and as a result of a plea agreement, he was placed on
deferred-adjudication community supervision.

 On October 17, 2003, about eleven and a half years after the Estrada assault and killing, Houston
homicide detective Robert King forwarded evidence of the unsolved Estrada murder to Orchid Cellmark
for DNA analysis. Appellant's DNA profile, from the sample he had been required to give when he was
placed on deferred adjudication for molesting his daughters and which was included in the CODIS data-bank, (2) matched DNA found on Estrada's body. Appellant was arrested for the murder. He confessed
to that crime, as well as to the murders of Tremblay, Rebollar, and Sanchez, and the aggravated sexual
assault of the fourteen-year-old student.

 The state sought a capital-murder conviction against appellant in the Estrada case. After the guilt
phase of the trial, the jury found appellant guilty and, at the punishment phase, it learned of the three other
murders and the aggravated sexual assault, as well as the details of appellant's molestation of his two
daughters. Additionally, the jury learned that appellant would frequently drug and choke his adult sexual
partners and have intercourse with them while they were unconscious or semi-unconscious. The jury
answered the special issues in favor of assessing the death penalty, and appellant was sentenced to death
on October 21, 2004.

Motion to Suppress

 In his first point of error, appellant argues that the trial court erred in overruling his motion to
suppress statements that he had made to police and that were recorded on audio tape. In these statements,
appellant confessed to committing four murders and an aggravated sexual assault. One recorded
confession concerned the Estrada murder and was played for the jury during guilt; the remaining four
recorded confessions concerned the Tremblay, Rebollar, and Sanchez murders and the aggravated sexual
assault of the fourteen-year-old student and were played for the jury at the punishment phase. Appellant
asserts that these confessions were obtained in violation of his Fifth and Fourteenth Amendment rights under
the United States Constitution and in violation of Article 38.23 of the Texas Code of Criminal Procedure. 
He contends that the statements were coerced because detectives engaged in a strategically planned series
of interviews that were unremitting in nature and showed no signs of abating. One detective quickly
followed the other, and when all three had finished, a new rotation began.

 Constitutional due process requires that a confession must have been voluntarily given before it may
be admitted into evidence. Michigan v. Harvey, 494 U.S. 344 (1990); Jackson v. Denno, 378 U.S. 368
(1964); Smith v. State, 779 S.W.2d 417 (Tex. Crim App. 1989). Echoing this dictate, Article 38.23
states, "No evidence obtained by an officer or other person in violation of any provisions of the Constitution
or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be
admitted in evidence against the accused on the trial of any criminal case." This Court does not agree that
appellant's confessions were the product of police coercion. Rather, we find that his confessions were
voluntary and that the trial court did not abuse its discretion in denying appellant's motion to suppress.

 In deciding whether appellant's confessions should be suppressed, it was incumbent on the trial
court to determine whether his statements were given voluntarily or were coerced. In evaluating the
voluntariness of confessions, a trial court is required to examine the totality of the circumstances surrounding
them. See Arizona v. Fulminante, 499 U.S. 279, 285-86 (1991); Colorado v. Connelly, 479 U.S. 157,
167 (1986); Creager v. State, 952 S.W.2d 852, 856 (Tex. Crim. App. 1997). As this Court has stated,
a confession "is 'involuntary,' for the purposes of federal due process, only if there was official, coercive
conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an
essentially free and unconstrained choice by its maker." Alvarado v. State, 912 S.W.2d 199, 211 (Tex.
Crim. App. 1995); see also Connelly, 479 U.S. at 167 ("We hold that coercive police activity is a
necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process
Clause of the Fourteenth Amendment.") The essential question for the trial court to determine was
"whether [appellant's] will was overborne by the circumstances surrounding the giving of [the]
confession[s]," Dickerson v. United States, 530 U.S. 428, 434 (2000), and our task on appeal is to
determine whether the trial court abused its discretion in resolving that question. Balentine v. State, 71
S.W.3d 763, 768 (Tex. Crim. App. 2002). 

 In resolving whether the trial court abused its discretion, this Court will give "almost total deference
to a trial court's determination of the historical facts" and review the court's application of the law to the
facts de novo. Id. Where the trial court has not made explicit findings of historical fact, as in this case, we
review the evidence in the light most favorable to the trial court's ruling and assume that the trial court made
implicit findings of fact that support the ruling. Id. The decision of the trial court will be sustained if it is
correct under any theory of law applicable to the facts of that case. State v. Ross, 32 S.W.3d 853, 855-56 (Tex. Crim. App. 2000).

 It is undisputed that appellant was in custody at the time he gave the confessions. He had been
arrested at 4:15 p.m. on October 24, 2003, pursuant to an arrest warrant obtained by officers on a multi-agency task force. After the arrest, appellant was taken to a police interview room, arriving at 4:53 p.m.,
and his handcuffs were removed. Officer Todd Miller spoke with appellant first; only appellant and Miller
were in the interview room. Miller offered appellant something to eat and drink and an opportunity to use
the restroom, but appellant declined the offers. At 5:00 p.m., Miller advised appellant of his legal rights,
including his right to remain silent, his right to an attorney, and his right to terminate the interview. Appellant
waived these rights, and Miller spoke with him about the Estrada murder for approximately three hours. 
Miller showed appellant a photograph of Estrada's body and told appellant that his DNA had been found
at the crime scene. According to Miller, appellant was "very cooperative and spoke freely, very matter
of factually [sic]," and each addressed the other by his first name. Appellant, however, did not admit any
involvement in the murder. Not making any progress, Miller ceased discussion about the murder and again
offered appellant the opportunity to use the restroom or have something to eat or drink, which appellant
again declined. Miller then left the interview room at 8:05 p.m. and briefly discussed what had happened
with the other task-force detectives.

 The detectives decided that Sergeant John Swaim should speak with appellant, and at 8:07 p.m.,
Swaim entered the interview room unaccompanied by other officers. He advised appellant of his legal
rights, and appellant agreed to talk with Swaim about the Estrada murder. At the suppression hearing,
Swaim testified that appellant was "paying a lot of attention. He was looking at me in the eye, listening to
every word. He was calm, cool, cooperative." Not making any progress toward obtaining information
about the murder, though, Swaim concluded the interview at 9:20 p.m. He took appellant to the restroom
and gave him a cup of coffee, and then returned with him to the interview room.

 At 9:25 p.m., Sergeant Roger Wedgeworth entered the interview room and spoke with appellant. 
The two talked until 10:15 p.m. No testimony was presented at the suppression hearing regarding the
substance of the discussion, and nor was evidence presented that indicated that Wedgeworth threatened,
coerced, or promised appellant anything in exchange for a statement.

 After Wedgeworth left the interview room, Miller re-entered at 10:20 p.m. to speak with appellant
a second time. Miller asked appellant whether he remembered his rights and whether appellant wanted
to waive those rights and continue to speak. Appellant acknowledged that he did remember his rights and
that he wanted to continue the interview. According to Miller, appellant appeared to be "a little more
subdued, a little more quiet. . . . Made frequent eye contact with me. He was very cognizant of person,
place and thing. All his answers were appropriate answers to the questions that I asked." Miller expanded
the scope of the discussion to include the Rebollar and Sanchez murders, in addition to the Estrada murder,
and showed appellant various crime-scene photographs. Appellant did not deny involvement in the crimes,
but said that he could not remember. Then, appellant told Miller that he wanted to talk hypothetically about
what had happened, but that he did not trust Miller; appellant indicated that he was more comfortable
talking with "John," referring to Detective John Swaim.

 Acting on appellant's willingness to speak about the crimes, Miller left the interview room and told
Swaim that appellant wanted to speak with him "hypothetically." Swaim re-entered the interview room
alone at 11:50 p.m., and according to Swaim, appellant said, "Sit down, John. Sit down." Referring to
a binder with the crime-scene pictures, appellant continued, "What would you say if I gave you these cases
and a couple of bonuses?" Swaim responded, "What's this hypothetical? What are you going to talk
about hypothetically?" Appellant then confided to Swaim, "Well, I have this evilness in me, and I think if
I tell you what I've done that it will release that evilness, and I would feel better." He went on to describe
the details of the murders and the aggravated sexual assault. 

 Following his initial admissions, appellant agreed to give tape-recorded statements confessing to
the crimes. As Swaim recounted, "I asked him if he wanted to make statements; and he agreed to do so. 
I asked him if taped would be okay. He agreed to that and said, [ ] 'Whatever you need to do, John, we'll
do it, whatever it is.'" Before making each of the five separate recorded statements, Swaim again
admonished appellant of his rights, and appellant agreed to waive them and to voluntarily give each
confession. The tape-recorded statements began at 12:08 a.m. and ended at 1:00 a.m.

 Given the totality of the circumstances surrounding appellant's taped confessions, this Court does
not conclude that the trial court abused its discretion in denying the motion to suppress. Nothing in the
interaction between appellant and the detectives suggests that appellant's will was "overborne" by the
circumstances surrounding the confession. Each interview was conducted by a single detective in an
interview room; appellant was not in handcuffs, was not deprived of food, beverage, or the opportunity to
visit the restroom, and was even given cigarettes by Swaim when appellant asked for them. Appellant
appeared to be calm during the interviews and was cooperative; he never asked to speak with an attorney
or to terminate the interview, even though he was informed of his rights on multiple occasions. There is no
indication that any detective threatened appellant or otherwise acted inappropriately. 

 Moreover, State's Exhibit 220, a letter that appellant wrote to a former neighbor on December 4,
2003, a little more than a month after the confessions were recorded, supports our conclusion that
appellant's confessions were not coerced by police activity, but were his free and unconstrained
statements. In the letter, appellant informed his former neighbor that, "after 13 hours of intense interrogation
I decided to do the right thing and voluntarily told them all. . . . I am going to face the fire . . .. Whatever
happens to me so that the victims' families and friends may find some closure." (Ellipses in the original).

 The trial court did not abuse its discretion in implicitly finding that the confessions were appellant's
free and unconstrained statements and in denying appellant's motion to suppress them. We overrule point
of error one.

Sufficiency of the Evidence


 In points of error two through seven, appellant attacks the legal and factual sufficiency of the
evidence supporting his capital-murder conviction. He argues that the evidence is both legally and factually
insufficient to prove that he specifically intended to cause Estrada's death (points of error six and seven,
respectively); that the evidence is both legally and factually insufficient to prove he murdered Estrada while
committing or attempting to commit aggravated sexual assault (points of error two and three, respectively);
and that the evidence is both legally and factually insufficient to prove that he murdered Estrada while
kidnapping or attempting to kidnap her (points of error four and five, respectively). 

 In deciding whether the evidence is legally sufficient to sustain a conviction, we must determine
whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could
have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S.
307, 319 (1979); Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). The jury is the
exclusive judge of the credibility of witnesses and of the weight to be given their testimony. Id. Likewise,
reconciliation of conflicts in the evidence is within the exclusive province of the jury. Id. If any rational jury
could have found that each of the elements had been proven beyond a reasonable doubt, we will not disturb
the verdict on appeal. Id.

 In deciding whether the evidence is factually sufficient to sustain a conviction, we will assume that
the evidence is legally sufficient but will view all of the evidence in the record without the prism of "in the
light most favorable to the verdict." Jones, 944 S.W.2d at 647-48. In reviewing factual sufficiency, this
Court may disagree with the jury's verdict, even if some probative evidence supports it, but we will set
the jury's verdict aside only if it is so contrary to the overwhelming weight of the evidence as to be clearly
wrong and unjust. Id. Examples of such a wrong and unjust verdict include instances in which the jury's
finding is "manifestly unjust," "shocks the conscience," or "clearly demonstrates bias." Id.

 To obtain a capital-murder conviction against appellant, the State was required to prove beyond
a reasonable doubt that appellant intentionally caused Estrada's death while kidnapping or attempting to
kidnap Estrada or while committing or attempting to commit the aggravated sexual assault of Estrada. See
Tex. Penal Code § 19.03 (a)(2). These are alternative means of committing the capital murder that the
State alleged in the indictment, and the jury could convict appellant under either theory. See id.; Aguirre
v. State, 732 S.W.2d 320, 326 (Tex. Crim. App. 1987) ("Because appellant's indictment did not allege
different offenses but only alleged different ways of committing the same offense, the court properly
furnished the jury with a general verdict form"). And as this Court has consistently held, "[W]hen multiple
theories are submitted to the jury, the evidence is sufficient to support a conviction so long as the evidence
is sufficient to support conviction for one of the theories submitted to the jury." Guevara v. State, 152
S.W.3d 45, 52 (Tex. Crim. App. 2004) (citing Kitchens v. State, 823 S.W.2d 256, 258 (Tex. Crim.
App. 1991)).

A. Murder in the Course of Committing or Attempting 

to Commit Aggravated Sexual Assault


 Appellant argues that the evidence is legally and factually insufficient to support a finding that he
intentionally caused Estrada's death or that he intentionally murdered her in the course of committing or
attempting to commit aggravated sexual assault. (3) 

 We find that the evidence is legally sufficient to support the jury's determination. Viewed in the
light most favorable to the verdict, the testimony and evidence at trial showed that Estrada was a quiet and
shy girl who did not speak English well and who usually walked or rode a bus to work. Her body was
found dumped behind a fast-food restaurant. Her pants had been removed, her shirt was open, her bra
had been cut open, her pantyhose appeared to be cut in the crotch and her underpants and hose had been
pulled below her pubic area. The murder weapon, a nylon cord with a wooden stick used as leverage for
tightening, remained wound around her neck. Estrada's vaginal area had a contusion deep inside that had
bled. DNA found at the crime scene matched appellant's, and appellant's audio-taped confession in which
he admitted killing Estrada was played for the jury. This same taped confession revealed that appellant had
specifically designed and crafted the murder weapon before the crime and that he had intentionally killed
Estrada to avoid discovery. In his confession, he said that 

 when I pushed it further, it got out of hand [and] she freaked out. . . . This wasn't a
consensual thing. . . . I remember I opened her blouse and she was resisting. . . . I had
this sick consumption, not like voices in my head but just driven that I was going to have
her regardless. . . . I remember I had a pair of shears. She had on black shorts; I cut them
off and her pantyhose but I didn't cut her panties. I don't know why. It got out of hand,
and she freaked out. And I knew this was not, this was going to be real bad and my life
was f****d forever. So I panicked and once again it was starting to become daylight so
to avoid discovery, again, I strangled her.


 This confession as well as the other evidence detailing the disheveled condition of Estrada's clothing
and the physical trauma inflicted upon her body indicated at least an attempted aggravated sexual assault. 
Indeed, there was evidence indicating that appellant raped Estrada before he killed her to avoid discovery. 
Given this evidence, any rational trier of fact could have found beyond a reasonable doubt that appellant
intentionally caused Estrada's death by strangling her and that he murdered Estrada in the course of
committing or attempting to commit aggravated sexual assault. We overrule points of error six and seven.

 We find that the evidence is also factually sufficient. Appellant admitted that he attacked Estrada
for sex and then strangled her to conceal the crime. The physical evidence at the crime scene corroborates
appellant's confession, and only scant evidence supports his claim of factual insufficiency. In his confession
to Sergeant Swaim, which was played for the jury, appellant stated, "I didn't set out to kill her. That was
not my intent but it got out of hand." This statement does not undermine the jury's verdict. 

 There was sufficient evidence before the jury that appellant intended Estrada's death. He admitted
to preparing the ligature used to kill Estrada before enticing her into his vehicle, which suggests
premeditation. He further admitted that he strangled Estrada to avoid discovery of his attack on her. Due
deference must be accorded to the jury regarding the weight and credibility of the evidence, and we
discern no basis on which to conclude that the jury's verdict is manifestly unjust, shocks the conscience,
or clearly demonstrates bias. The jury's finding that appellant intentionally killed Estrada and that he
murdered her in the course of committing or attempting to commit aggravated sexual assault is not so
contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. We overrule points
of error two and three.

B. Murder in the Course of Committing or Attempting to Commit Kidnapping


 Appellant next argues that the evidence was legally and factually insufficient to support a finding that
he murdered Estrada in the course of kidnapping or attempting to kidnap her. We concluded in analyzing
points of error two and three that the evidence presented at appellant's trial is both legally and factually
sufficient to support a finding that appellant committed capital murder by intentionally causing Estrada's
death in the course of committing or attempting to commit aggravated sexual assault. We therefore need
not address appellant's claim regarding an alternative method of committing the same capital murder. See
Guevara, 152 S.W.3d at 52. 

 We overrule points of error four and five.

Mitigation Evidence

 Points of error eight through ten concern appellant's decision not to present mitigation evidence. 
Appellant alleges that his Eighth and Fourteenth Amendment rights were violated when the trial court failed
to inquire at the punishment phase whether there had been an investigation regarding the existence of
mitigation evidence and what the results of an investigation had revealed (point of error nine). Appellant
also claims that the trial court's failure to inquire into the existence and results of a mitigation investigation
acted to deny him his Sixth Amendment right to effective assistance of counsel (point of error ten). 
Appellant also argues that the trial court erred in failing to inquire whether his decision to waive the
presentation of any mitigating evidence was competent, knowing, intelligent, and voluntary, and that this
error renders his death sentence unconstitutional under the Eighth and Fourteenth Amendments (point of
error eight). 

 It is apparent from the record that appellant instructed his attorneys to approach the punishment
phase of his trial in such a way that the death penalty would be imposed. Appellant's desire that the jury
impose the death penalty was expressed in trial counsel's opening argument at the punishment phase as
follows:

 Ladies and gentlemen, this is going to be very short. . . . Something unusual happened
yesterday and the evidence will show it, that when you returned your verdict of guilty in this
case, [trial co-counsel] and I may have been dissatisfied with the verdict. [Appellant] was
quite satisfied. Against our advice, against our better judgment, against our 40 years of
experience, [appellant] has asked on his behalf that we ask you to answer those questions
in such a way that he's sentenced to death.

 

 Having done this as many years as I have, I found that a very, very, troubling thing, but it
is his life. It is where he is and it is what he thinks should happen to him based upon how
he has lived his life.

 

* * *

 

 During the course of this period from the time he got placed on probation [for the
indecency with his two daughters], he became-he accepted a different lifestyle. That is
one where he accepted the Lord in his life, never with the courage to come forward, but
with the realization that one day he was probably going to get caught.

 

 And he told us-and the evidence will show-that he understood one thing about his
conversion. While he would ultimately be free from the pain and penalty of sin, that is,
eternal damnation, he has to pay the consequence of what he has done.

 

 And he believes if the State believes and you, the citizens representing the State, believe
that the ultimate penalty is death by lethal injection, then so be it. He is prepared to give
up his life in this instance for the things that he has done. And he is prepared to do that,
ladies and gentlemen, in spite of the fact that I submit to you that since [being] placed on
probation, things began to happen to help him to identify the things in his life that had gone
wrong.

 

* * *

 

 [Appellant] still believes that despite all of that . . . it is time for him to sacrifice his life for
what he has done.

 

 As difficult as that is for me to tell you, that is where he is. So throughout the course of this
trial, unless there are legal matters that come up, [trial co-counsel] and I are going to sit
silent because we, too, agree that maybe the victims in this case need this forum to have
their say. But we are not going to unduly delay these procedures. Thank you.


 Immediately after the State concluded its punishment evidence and rested, trial counsel indicated
out of the jury's presence that appellant would rest on the issue of punishment without presenting evidence
and would waive closing argument. Trial counsel stated that he had discussed the matter further with
appellant since the presentation of opening argument and that appellant had maintained his position of
having the jury answer the special issues in such a way as to result in the imposition of the death penalty. 
As counsel informed the trial court, "He has made it quite clear to me that he doesn't want me to in any way
argue to the contrary to the jury." Upon the trial court's direct inquiry to appellant whether trial counsel's
representations to the court regarding appellant's desires were accurate, appellant responded, "That is very
accurate." Then, in accordance with appellant's instruction, trial counsel rested on punishment in the jury's
presence without presenting evidence and later made the following statement regarding the presentation of
a closing argument: "Your honor, at this time the defense waives any argument in this case at the request
of [appellant], but against the very strong advice of [trial co-counsel] and myself."

A. Trial court's failure to inquire about mitigation evidence

 Appellant argues that the trial court was in error because it acquiesced to his demand to not present
mitigating evidence or argument at the punishment phase without first inquiring whether trial counsel had
conducted an investigation regarding the existence of mitigation evidence and, if so, determining what the
results of an investigation had revealed. (4) In circumstances in which a competent capital-murder defendant
knowingly, intelligently, and voluntarily forgoes the presentation of any mitigation evidence at the punishment
phase, however, the Eighth and Fourteenth Amendments do not require the trial court to make such an
express inquiry.

 In Lockett v. Ohio, 438 U.S. 586 (1978), a plurality of the United States Supreme Court held that
the Eighth and Fourteenth Amendments require that the sentencer "not be precluded from considering, as
a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the
offense that the defendant proffers as a basis for a sentence less than death." Article 37.071 of the Texas
Code of Criminal Procedure states that the defendant in a capital case may present evidence as to any
relevant matter "including evidence of the defendant's background or character or the circumstances of the
offense that mitigates against the imposition of the death penalty," but the Supreme Court, this Court, and
the Code of Criminal Procedure have never required that a defendant proffer to the trial court all the
evidence he believes would be mitigating when he does not intend to present that same evidence to a jury. 


 In a Texas capital-murder prosecution, evidence presented at the punishment phase is not confined
within categorical labels of aggravation or mitigation. Rather, "[a] juror may give any weight or no weight
to particular evidence in determining the special issues. All that the constitution requires is that he not be
precluded from considering evidence offered in mitigation and that he be provided a vehicle to give effect
to such evidence." Soria v. State, 933 S.W.2d 46, 65 (Tex. Crim. App. 1996).

 In considering the evidence presented at the punishment phase, each of the jurors decides whether
a particular piece of evidence is mitigating, aggravating, or both aggravating and mitigating, and each of the
jurors is free to assign whatever weight that juror believes is appropriate when considering a particular
piece of evidence in answering the special issues. Given this ambiguity in determining how an individual
juror may consider a particular piece of evidence, a trial court cannot know what evidence the jurors might
consider "mitigating," and cannot, therefore require counsel to produce such evidence.

 We are persuaded by the reasoning of the Ohio Supreme Court when it addressed a similar
complaint by a capital defendant who argued that the presentation of mitigation evidence to the jury could
not be waived; "[A] rule requiring the presentation of mitigating evidence would be impossible to enforce. 
Even if the court attempted to require an attorney to present mitigation evidence, it cannot force an unwilling
defendant to provide that evidence to his attorney." Ashworth v. Ohio, 706 N.E.2d 1231, 1237 (Ohio
1999). (5) 

 This same logic applies to appellant's claim. Just as a rule requiring the presentation of mitigating
evidence to a jury is unenforceable in practice, requiring the trial court to inquire whether trial counsel had
conducted an investigation regarding the existence of mitigation evidence and determining what the results
of such an investigation had revealed would be impracticable. While it may very well be incumbent upon
trial counsel to conduct an investigation into mitigation, such an investigation may be limited or even blocked
by the defendant's refusal to cooperate. In situations in which there are concerns regarding the existence
and caliber of trial counsel's investigation into possible mitigation evidence, such allegations may be
examined through a writ of habeas corpus that alleges ineffective assistance of counsel. See, e.g., Wiggins
v. Smith, 539 U.S. 510, 524-25 (2003) (stating that investigations into mitigating evidence should comprise
efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating
evidence that may be introduced by the prosecutor); see also Thompson v. State, 9 S.W.3d 808, 813-14
(Tex. Crim. App. 1999) (stating that ineffective assistance of counsel claims are often best raised through
a collateral attack); Ex parte Torres, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997) (same). 

 For these reasons, we conclude that the trial court did not err by failing to make an explicit inquiry
into the existence and substance of mitigation evidence. We overrule point of error nine.

B. Trial court's failure to inquire about mitigation evidence as

a denial of the right to effective assistance of counsel


 Appellant also claims that the trial court's failure to ascertain the existence, scope, and results of
trial counsel's mitigation investigation acted to deprive him of his right to the effective assistance of counsel. 
The alleged error, he suggests, is tantamount to a Sixth Amendment denial of counsel because the decision
not to present mitigation evidence is akin to a decision to proceed without the assistance of counsel. In
short, appellant claims that "there [was] a complete denial of counsel in the instant situation" and argues that
the trial court erred by failing to ensure that appellant's decision to effectively proceed without the
assistance of counsel warrants a reversal of the punishment proceeding. 

 Rather than being analogous to a structural issue such as the "complete denial of counsel," as
appellant expresses it, the decision whether to present mitigation testimony concerns trial strategy and the
introduction or non-introduction of evidence. Unlike a defendant's decision whether to testify, which is
absolute, decisions regarding trial strategies remain counsel's to make, and trial counsel shoulders the
primary responsibility of investigating the existence and scope of mitigation and informing the capital
defendant of any such evidence discovered, as well as the advantages and disadvantages of presenting such
mitigation evidence to the jury. (6) Nothing in the record before us suggests that trial counsel failed to advise
appellant regarding appellant's decision to forgo the presentation of mitigation evidence. Indeed, the record
before us suggests that counsel indicated several times that the choice not to present mitigating evidence
was appellant's and that, in so choosing, appellant was acting contrary to the advice of counsel. Point of
error ten is overruled.

C. Trial court's failure to determine whether the decision to waive the presentation

 of mitigation evidence was competent, knowing and intelligent, and voluntary


 Appellant also argues that the trial court erred when it did not ensure that the waiver of his right to
present mitigating evidence was competent, knowing, intelligent, and voluntary. 

 At the outset, we note that appellant does not argue that the United States Constitution or the
Constitution or laws of Texas require that relevant mitigation evidence must be presented to the jury. See,
e.g., Wallace, 893 P.2d at 508 (whether a capital defendant could waive presentation of mitigation
evidence without running afoul of the ban against arbitrary and unreliable application of the death penalty);
Ashworth, 706 N.E.2d at 1236 (appellant argued that the Eighth Amendment prohibits a capital defendant
from withholding all mitigating evidence from the fact-finder); Daniel R. Williams, Mitigation and the
Capital Defendant Who Wants to Die: A Study in the Rhetoric of Autonomy and the Hidden
Discourse of Collective Responsibility, 57 Hastings L.J. (2006). We further note that appellant's claim
does not concern waiver of the submission of the mitigation special issue to the jury, which was given. This
particular claim does not even allege that counsel failed to investigate mitigation evidence adequately. See,
e.g., Wiggins, 539 U.S. at 524-25. Here, appellant alleges only that the trial court erred when it failed to
expressly ensure that his decision to not present any mitigation evidence at the punishment phase was valid. 


 A capital defendant has the right to present mitigating evidence. Art. 37.071, § 2(a)(1) (the
defendant in a capital case may present evidence as to any relevant matter at the punishment phase
"including evidence of the defendant's background or character or the circumstances of the offense that
mitigates against the imposition of the death penalty"). We have held, however, that a capital defendant
may also "waive reliance upon and submission of the mitigation issue. . .. Such a waiver must, however,
be affirmative and express." Mosley v. State, 983 S.W.2d 249, 264 (Tex. Crim. App. 1998). See also, 
Edwards v. Arizona, 101 S. Ct. 1880 (1981)(quoting Johnson v. Zerbst, 304 U.S. 458 (1938); "A
waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege"); Lockett,
438 U.S. at 586 (the Eighth and Fourteenth Amendments require that the sentencer "not be precluded from
considering, as a mitigating factor, any aspect of a defendant's character or record and any of the
circumstances of the offense that the defendant proffers as a basis for a sentence less than death"); But
these authorities do not support a finding that a capital-murder defendant must present mitigating evidence:
The defendant may present evidence (Art. 37.071); the sentencer cannot "be precluded from considering
any [evidence] that the defendant proffers" (Lockett at 586)(emphasis added).

 The record before this Court convinces us that appellant's decision to forgo the introduction of any
mitigation evidence was valid. It is true that the trial court made no explicit finding of competence regarding
appellant's waiver of the right to present mitigating evidence. We agree with the Ohio Supreme Court,
however, that a competency evaluation is not necessary in every case in which a capital defendant chooses
to waive the presentation of mitigation evidence. Ashworth, 706 N.E.2d at 1237. Rather, " [a] trial court
should be cognizant of actions on the part of the defendant that would call into question the defendant's
competence. However, absent a request by counsel, or any indicia of incompetence, a competency
evaluation is not required." Appellant does not point us to, nor have we located, anything in the record that
calls appellant's competence into question or anything that should have alerted the trial court or his trial
counsel to a need to investigate appellant's competence. To the contrary, the record shows that appellant
appeared competent to make the waiver.

 At the beginning of the punishment phase, the trial court questioned appellant to determine whether
he was competent and could knowingly, intelligently, and voluntarily enter a plea of true concerning two
motions to adjudicate. These two motions, concerning appellant's deferred-adjudication community
supervision for indecency with his daughters, were carried with the capital-murder trial. The trial court, in
questioning appellant regarding his pleas of true and ultimately accepting them, implicitly expressed its
confidence that appellant was competent and could knowingly, intelligently, and voluntarily waive his rights. 


The Court: [Appellant], you're charged with - in each case - an Amended Motion to Adjudicate your
guilt, allegations that you violated your deferred adjudication in Cause No. 773561 for the
offense of indecency with a child and allegations that you violated your deferred
adjudication in Cause No. 767372 for indecency with a child. Do you understand these
allegations?


[Appellant]: Yes, Your Honor.


The Court: All right. And, [trial counsel] do y'all waive formal reading of the Amended Motions to
Adjudicate Guilt?


[Counsel]: We do, Your Honor.


The Court: Was the aggravated sexual assault reduced?


[Counsel]: It was, Judge.


The Court: Okay. The range of punishment, [appellant], for someone found guilty of indecency with
a child as you stand charged in each of these causes, a second degree felony, is not less
than two years nor more than twenty years in the penitentiary and a possible fine not to
exceed $10,000. Do you understand the range that applies to each of these?


[Appellant]: Yes, Your Honor.


The Court: And apparently you have not reached any agreement with the State concerning these
matters; is that correct [trial counsel]?


[Counsel]: Yes, Judge.


The Court: All right. How do you plead, [Appellant], to the allegations in each of these Amended
Motions to Adjudicate Guilt, true or nor true?


[Appellant]: True.

* * *

The Court: All right. Are you pleading true because these allegations are true?


[Appellant]: Yes, Your Honor.


The Court: Has anybody made any promise to you?


[Appellant]: No, Your Honor.


The Court: Now, [Appellant], let me explain. You're entitled to a full hearing with witnesses and
testimony about these allegations that you violated your deferred adjudication. Do you
understand that?


[Appellant]: Yes, Your Honor, I understand.


The Court: Do you understand that in pleading true that you are essentially giving up your right to make
the State prove these allegations?


[Appellant]: Absolutely.


The Court: All right. Has anybody made any promise to you to get you to enter your pleas of true?


[Appellant]: No. Your Honor.


The Court: Has anybody threatened you to get you to enter your pleas of true?


[Appellant]: No.


The Court: Are you of sound mind?


[Appellant]: I believe so.


[Court]: And when you violated your deferred adjudication as alleged in each of these Amended
Motions to Adjudicate Guilt, were you of sound mind?


[Appellant]: Yes, Your Honor.


The Court: Have you spoken with [trial counsel] about your options and your rights as it relates to
these Amended Motions to Adjudicate Guilt?


[Appellant]: Yes, Your Honor.


The Court: Is there anything you'd like to ask him or me before we go any further?


[Appellant]: I can't think of anything at all.


The Court: All right. [Trial counsel], in consulting with [appellant], is it your opinion that he's mentally
competent to enter his pleas of true?


[Counsel]: Yes, Your Honor.


The Court: And is he doing this, in your opinion, voluntarily with full knowledge of the consequences?


[Counsel]: Yes, Judge.


There is no indication in the record that appellant's level of competence changed between the adjudication
hearing and the beginning of the punishment phase.

 As to whether the waiver was knowing, intelligent, and voluntary, we are persuaded by the
reasoning of the Supreme Court of Washington in State v. Woods, 23 P.3d 1046, 1073 (Wash. 2001). 
In analyzing a capital defendant's decision to waive the presentation of mitigation evidence, the Woods
Court said that "a trial court need not conduct a 'colloquy' to ensure that a capital defendant's decision to
waive the right to present mitigating evidence is a voluntary, intelligent, and knowing choice. Rather, like
the evaluation of a defendant's waiver of the right to testify on his or her own behalf, the judge may assume
a knowing waiver of the right from the defendant's conduct." Woods, 23 P.3d at 1073 (internal quotation
marks omitted). 

 The record before us demonstrates that there was sufficient evidence before the trial court for it
to find that appellant's waiver was knowing, intelligent, and voluntary. The trial court had determined that
appellant was competent to enter pleas regarding the motions to adjudicate, and appellant's responses to
the trial court's questions indicated that he understood what a knowing and intelligent waiver entails. 
Moreover, appellant expressly ratified trial counsel's representations that appellant desired to have the
death penalty imposed, even after further admonition by trial counsel regarding the decision. The knowing
and intelligent nature of the waiver is further confirmed with testimony regarding appellant's high intelligence,
including the expert opinion of a licensed professional counselor who treated appellant and found him to
have superior abstract reasoning skills and intelligence. The record supports the conclusion that the waiver
was voluntary and made in clear opposition to counsel's advice.

 The record before this Court demonstrates that appellant made a valid waiver with full
understanding that available mitigation evidence could be presented in seeking a sentence of life rather than
a death sentence, but that appellant instructed his attorneys not to present it. Viewing the record as a
whole, the trial court implicitly and correctly ascertained that appellant made a competent, knowing,
intelligent, and voluntary waiver of his right to present mitigation evidence. (7) We overrule point of error
eight.

Ineffective Assistance of Counsel

 In points of error eleven through thirteen, appellant claims that he was deprived of his constitutional
right to the effective assistance of counsel. Ineffective assistance of counsel claims are evaluated under the
familiar test announced by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668
(1984). This test requires a showing of both deficient performance by counsel and prejudice to the
defendant. Id.; Thompson, 9 S.W.3d at 812. The claim must be "firmly founded in the record" and "the
record must affirmatively demonstrate" its meritorious nature. Thompson, 9 S.W.3d at 813. 

 In point of error eleven, appellant asserts that, "[w]hile the Appellant may have desired that the jury
answer the special issues in such a manner that he receive a death sentence, at no time did he waive his right
to counsel . . .. At no time did [appellant] instruct his attorneys not to object or cross-examine." (8) 

 Even if we were to find that trial counsel failed in their duty to their client by failing to cross-examine many of the state's witnesses during the punishment phase, appellant cannot demonstrate
prejudice. Rather than present mitigation evidence, trial counsel informed the trial court and the jury that
appellant was satisfied with the jury's verdict of guilt, that he had confessed his sins and believed he had
received forgiveness from God, that he understood he had to atone for his crimes, and that he had asked
his attorneys to request that the jury answer the special issues so that the death penalty would be imposed. 
Appellant confirmed that such was his desire when questioned by the trial court.

 When a client explicitly directs counsel to take a specific action that is legal and a reasonable trial
strategy, we will not find counsel ineffective when they accede to the client's articulated wishes. 
Appellant's explicit instructions to his trial counsel were to ask for the death sentence. His counsel did as
they were instructed and achieved the outcome that appellant desired. Appellant cannot, therefore, assert
that, had counsel diligently and extensively cross-examined every witness, the outcome would have
changed. We overrule point of error eleven. 

 Because the trial record is usually undeveloped concerning the reasons for counsel's choices
surrounding the challenged conduct, direct appeal is generally an inadequate vehicle for raising ineffective
assistance claims. Id. at 813-14; see also Ex parte Torres, 943 S.W.2d at 475 ("In most instances, the
record on direct appeal is inadequate to develop an ineffective assistance claim," and such claims "might
be substantiated through additional evidence gathering in a habeas corpus proceeding"). Counsel's
conduct is reviewed with great deference and without the distorting effects of hindsight. Thompson, 9
S.W.3d at 813. As this Court has stated, "[T]rial counsel should ordinarily be afforded an opportunity to
explain his actions before being denounced as ineffective." Rylander v. State, 101 S.W.3d 107, 111 (Tex.
Crim. App. 2003). Absent such an opportunity, an appellate court should not find deficient performance
unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." 
Garcia v. State, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001). In this case, however, the record is
sufficient to resolve the challenges appellant raises as to ineffective assistance of counsel.

 In point of error twelve, appellant argues that his trial counsel was ineffective when he did not
object to a hearsay statement at the guilt phase that semen was found in Estrada's mouth. He contends the
statement was hearsay because the detective had not performed the scientific analysis himself and could
have no first-hand knowledge of the existence of such evidence. Counsel later elicited testimony from an
Orchid Cellmark forensic examiner that the material given to her by the State for testing did not include
semen. Even if counsel erred in failing to object to the detective's testimony, he fulfilled the advocate's role
by diligent cross-examination that elicited countering evidence. In point of error thirteen, appellant argues
that his trial counsel was ineffective when he did not object to testimony during the punishment phase that
appellant characterizes as impermissible victim-impact evidence. As with his complaint in points of error
eleven and twelve, appellant cannot demonstrate prejudice; he instructed his counsel to proceed in such
a way that the jury would assess the death penalty, and counsel did so. Additionally, during the punishment
hearing, the jury heard testimony about other crimes committed by appellant: three other murders, an
aggravated sexual assault on a minor, and the molestation of his two biological daughters. Given the state's
evidence at the punishment phase and appellant's instructions to his counsel, we cannot conclude on the
record before us that the challenged conduct of trial counsel was so outrageous that no competent attorney
would have engaged in it or that the challenged conduct resulted in prejudice to appellant. We overrule
points of error twelve and thirteen.

Motions for Mistrial

 Appellant contends in points of error fourteen through sixteen that the trial court abused its
discretion in overruling his motions for mistrial on three occasions during the punishment phase: after
appellant's sister testified that she and the rest of appellant's family believed that he should receive the death
penalty (point of error fourteen); after a detective testified that capital-murder cases are automatically
appealed in a process that can take "years and years" (point of error fifteen); and after a detective gave
hearsay testimony that semen was found in the vomit of another of appellant's victims, nine-year-old
Rebollar (point of error sixteen). In making these claims, appellant does not persuade us that a mistrial
should have been granted. On each occasion, the trial court promptly sustained appellant's objections to
the challenged testimony and gave instructions to the jury to disregard the challenged testimony and to not
consider any of the challenged statements for any purpose. (9)

 A mistrial is a device used to halt trial proceedings when error is so prejudicial that expenditure of
further time and expense would be wasteful and futile. Ladd v. State, 3 S.W.3d 547, 567 (Tex. Crim.
App. 1999). If an impartial verdict cannot be reached, or if a verdict of conviction could be reached but
would have to be reversed on appeal due to an obvious procedural error, a trial court may properly
exercise its discretion to declare a mistrial. Id. The determination of whether a given error necessitates a
mistrial must be made by examining the particular facts of the case. Id.

In cases where improper testimony is given, either deliberately or inadvertently, this Court has held that we
rely upon "what amounts to an appellate presumption that an instruction to disregard the evidence will be
obeyed by the jury." Id. 

 This Court "puts its faith in the jury's ability, upon instruction, consciously to recognize the potential
for prejudice, and then consciously to discount the prejudice, if any, in its deliberations." Id. Consequently,
the trial court's instruction is said to have "cured" any harm deriving from the improper testimony. Id. This
curative presumption remains true except in extreme cases where it appears that the evidence is clearly
calculated to inflame the minds of the jury and is of such a character as to suggest the impossibility of
withdrawing the impression produced on their minds. Id. We discern no such concern here.

 In this case, we will assume, as the trial court did, that the challenged testimony was improper. See
Simpson v. State, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003) ("The wishes of the victim's family
members as to the defendant's fate fall beyond the parameters of victim-impact evidence and are not
admissible"); Caldwell v. Mississippi, 472 U.S. 320, 324-30 (1985) (holding that it is constitutionally
impermissible to rest a death sentence on a determination made by a jury that has been led to believe by
the State's argument that the jury's decision was not final and would be reviewed because the argument
shifted the responsibility for determining the appropriateness of the defendant's death from the sentencer
to elsewhere); Tex. R. Evid. 801, 802 (Hearsay Rules). Even so, the trial court's instruction to disregard
sufficiently cured any error in light of the evidence in support of the jury's verdict on punishment. See
Simpson, 119 S.W.3d at 272-74.

 As the State points out, ample evidence in addition to appellant's rape or attempted rape and
murder of Estrada was presented at the punishment phase. This evidence included appellant's audio-taped
confessions to four other similar brutal crimes. The jury also learned that appellant had sexually molested
and mistreated his own daughters and that he had drugged and choked several adult sexual partners.

 After reviewing the nature and extent of the substantial punishment evidence against appellant and
the trial court's prompt instructions to disregard the challenged testimony, we conclude that any prejudice
flowing from the challenged testimony was cured. The challenged testimony was not clearly calculated to
inflame the minds of the jurors and was not of such a character as to suggest the impossibility of
withdrawing the impression produced on their minds. The trial court did not abuse its discretion in
overruling appellant's motions for mistrial. We overrule points of error fourteen, fifteen, and sixteen.

Constitutionality of Article 37.071 of the Texas Code of Criminal Procedure

 In his seventeenth point of error, appellant contends that the omission of a burden of proof in the
mitigation special issue, which instructs the jury to consider all evidence in determining whether sufficient
mitigating circumstances warrant a life sentence instead of a death sentence, is unconstitutional. See Art.
37.071 § 2(e)(1). In making this claim, appellant relies on Apprendi v. New Jersey, 530 U.S. 466, 476,
482-83 (2000), which holds, "If a state makes an increase in a defendant's authorized punishment
contingent on the finding of a fact, that fact, no matter how the state labels it, must be found by a jury
beyond a reasonable doubt." Ring v. Arizona, 536 U.S. 584, 602 (2002), discussing Apprendi. 
Essentially, appellant argues that the burden should rest with the State to prove lack of mitigation beyond
a reasonable doubt, but that the burden to convince the jury to forgo a death sentence for that of life was
effectively and wrongfully placed on him. 

 This Court has previously addressed and rejected this same argument: "We have repeatedly held
the absence of a burden of proof in the mitigation issue does not violate due process. And we have
specifically rejected the claim that the absence of a burden of proof violates Apprendi. We have likewise
rejected such claim as violating Ring." Hankins v. State, 132 S.W.3d 380, 386 (Tex. Crim. App. 2004)
(internal citations omitted); see also Howard v. State, 941 S.W.2d 102, 119 (Tex. Crim. App. 1996);
Blue v. State, 125 S.W.3d 491, 501 (Tex. Crim. App. 2003). "Nothing the jury or judge decided during
punishment could have enhanced [appellant's] sentence beyond the prescribed range. Further, Apprendi
did not address who bears the burden of proof but focused on who should be the fact-finder for sentence
enhancement." Allen v. State, 108 S.W.3d 281, 285 (Tex. Crim. App. 2003). Appellant attempts to
convince us that our previous decisions are incorrect, but we decline to revisit the issue, especially when
appellant presented no mitigation evidence for the jury to consider during the punishment phase. We
overrule point of error seventeen.

 In his eighteenth, nineteenth, and twentieth points of error, appellant complains that the rule
prohibiting the trial judge, the State, the defendant, or defense counsel from informing the jury that a failure
of the jury to agree on a special issue would result in a sentence of life rather than a death sentence being
imposed is unconstitutional. See Art. 37.071 §§ 2(a)(1), (g). Appellant had requested and was denied
a charge instructing the jury, "If any one of you should answer no to Special Issue Number One, the Court
shall impose a sentence of imprisonment for life upon the Defendant." Appellant also objected to the lack
of such an instruction regarding Special Issue Number Two. Appellant argues that the requested
instructions were required under his Sixth Amendment right to a jury trial (point of error eighteen), his
Eighth Amendment right to be free of cruel and unusual punishment (point of error nineteen), and his
Fourteenth Amendment right to due process (point of error twenty). This Court, however, has repeatedly
rejected arguments raising this and similar claims. See Blue v. State, 125 S.W.3d at 505; Turner v. State,
87 S.W.3d 111, 118 (Tex. Crim. App. 2002). The essence of these holdings has been that there is no
constitutional violation in not informing the jurors of the effect of their individual answers. Moreover,
nothing in the statute prohibits any single juror from voting as his or her conscience dictates. We overrule
points of error eighteen, nineteen, and twenty.

 We affirm the judgment of the trial court.


Delivered: December 12, 2007

Do not publish
1. Unless otherwise indicated, all references to Articles refer to the Code of Criminal Procedure.
2. "CODIS: refers to the Combined DNA Index System that is jointly maintained by the Federal Bureau of
Investigation and various state and local agencies.
3. Texas Penal Code Section 22.021 (1992) (aggravated sexual assault) states that a person commits an offense
if the person: intentionally or knowingly causes the penetration of the anus or female sexual organ of another person
by any means, without that person's consent; causes the penetration of the mouth of another person by the sexual organ
of the actor, without that person's consent; or causes the sexual organ of another person, without that person's consent,
to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor; and if the person: causes
serious bodily injury or attempts to cause the death of the victim or another person in the course of the same criminal
episode; by acts or words places the victim in fear that death, serious bodily injury, or kidnapping will be imminently
inflicted on any person; by acts or words occurring in the presence of the victim threatens to cause the death, serious
bodily injury, or kidnapping of any person; or uses or exhibits a deadly weapon in the course of the same criminal
episode.

 Texas Penal Code Section 15.01 (1992) (criminal attempt) states that a person commits an offense if, with specific
intent to commit an offense, he does an act amounting to more than mere preparation that tends but fails to effect the
commission of the offense intended. If a person attempts an offense that may be aggravated, his conduct constitutes
an attempt to commit the aggravated offense if an element that aggravates the offense accompanies the attempt.
4. More than ten months before trial, counsel had requested and received from the trial court funding for a
mitigation investigator. In granting this motion, the trial judge added to the order a handwritten comment stating,
"Defense to approach with estimates for future work." This statement indicates that the judge was not only familiar with
the substance of the motion when granting it, but was amenable to additional funding for future investigative expenses.
Before being informed that mitigation evidence would not be presented by appellant, the trial court was aware that
counsel had received funds that were dispersed to employ a mitigation expert and could reasonably presume an
investigation had been conducted. Such a presumption is validated by trial counsel's several statements indicating that
appellant was acting contrary to counsel's advice. These same statements also indicate that appellant was made aware
of available mitigation evidence, but did not want to have it presented. 
5. This is the same conclusion reached by the Oklahoma Court of Criminal Appeals in the same context four years
earlier. As the Oklahoma court wrote, "[A] rule requiring the presentation of mitigating evidence would not be
enforceable. Even if the court could force an attorney to attempt to present mitigating evidence, it cannot force an
unwilling defendant to provide that evidence to his attorney." Wallace v. Oklahoma, 893 P.2d 504, 511 (Okla. Crim. App.
1995). 
6. See, e.g., Woods v. Washington, 23 P.3d 1046, 1073 (Wash. 2001) ("[T]he decision of whether or not to present
mitigating evidence . . . is one that is influenced by trial strategy[, and] the responsibility for informing the defendant
of this right and discussing the merits and demerits of the decision resides with defense counsel"). 
7. We note that, while it is not constitutionally necessary, to unambiguously safeguard the capital defendant's
rights and to preserve the clarity of the appellate record in situations in which the trial court learns that the defendant
wishes to proceed without presenting any evidence during the punishment phase, the trial court may make an inquiry
on the record outside of the jury's presence regarding the defendant's decision.
8. The state misreads appellant's pleadings to complain that his trial counsel was ineffective because they did
not present any mitigation evidence at the punishment phase. Although the state accurately states that appellant
instructed his attorneys not to present mitigating evidence, that is not appellant's point of error: "Trial counsel denied
the Appellant his 6th Amendment right to the effective assistance of counsel by deciding to 'sit silent' during the
punishment phase of trial after Shore reportedly asked that they argue he receive the death penalty."
9. Prompt instructions to disregard are presumed to cure any harm emanating from the allegedly improper
testimony. Long v. State, 823 S.W.2d 259, 270 (Tex. Crim. App. 1991).